Filing # 192623563 E-Filed 02/23/2024 02:30:59 PM

**IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT**
**IN AND FOR COLLIER COUNTY, FLORIDA**
**CIVIL DIVISION**

LYNNE M. BUCKLIN,                                         Case No.: _____
an individual,

      Plaintiff,

v.

BANK OF AMERICA, N.A.,
a National Banking Association,

      Defendant.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

**COMES NOW**, Plaintiff, Lynne M. Bucklin ("Mrs. Bucklin" or "Plaintiff"), by and through her undersigned attorneys, and hereby sues Defendant, BANK OF AMERICA, N.A. ("Bank of America" or "Defendant"), and alleges the following:

## NATURE OF ACTION

1.    Plaintiff, Mrs. Bucklin, is sixty-seven (67) years old and the recent victim of fraud by unknown perpetrator(s).

2.    Soon after unexpectedly losing her husband to a heart attack, Mrs. Bucklin was victimized by a series of fraudulent electronic communications and phone calls from one or more cyber-criminals purporting to be an investigative officer and financial expert for the Federal Trade Commission ("FTC"), as part of a sophisticated social engineering scam to steal over $1,500,000.00 from two (2) accounts Mrs. Bucklin had with Defendant, Bank of America.

FILED: COLLIER COUNTY, CRYSTAL K. KINZEL, CLERK, 02/23/2024 02:30:59 PM

3.     The fraudster(s) affected several fraudulent electronic and wire transfers from Mrs. Bucklin's accounts with Defendant, all of which were promptly reported as unauthorized when discovered.

4.     The fraudulent funds transfers at issue involve, *inter alia*, Plaintiff's personal checking account (ending 2226) ("Personal Account") and an account belonging to her late husband's estate, The Estate of Charles S. Bucklin ("the Estate") (ending 5668) ("Estate Account") (collectively, "Plaintiff's Accounts" or "the Accounts"). At all times material to this action, Mrs. Bucklin, in her capacity as personal representative of the Estate, was the administrator of the Estate Account.

5.     During the period of February 24, 2022, through March 11, 2022, the perpetrator(s), posing as an FTC representative, gained unauthorized access to Mrs. Bucklin's Accounts and affected the following wire transfers from her Personal Account to an unknown individual's bank account in Albany, Georgia, and BAM Trading Services, Inc., d/b/a Binance.US ("Binance"), a cryptocurrency exchange platform:

| DATE | AMOUNT | FINANCIAL INSTITUTION / RECIPIENT |
|---|---|---|
| Feb. 24, 2022 | $69,900.00 | Regions Bank / Sandra Leaper Rickert |
| Feb. 28, 2022 | $254,369.00 | Silvergate Bank / BAM Trading Services, Inc. |
| March 3, 2022 | $269,000.00 | Silvergate Bank / BAM Trading Services, Inc. |
| March 9, 2022 | $369,000.00 | Silvergate Bank / BAM Trading Services, Inc. |
| March 11, 2022 | $371,000.00 | Silvergate Bank / BAM Trading Services, Inc. |
| **TOTAL** | **$1,323,269.00** | |

6.      Additionally, on March 14, 2022, the perpetrator(s) made an unauthorized electronic funds transfer from the Estate Account to Mrs. Bucklin's Personal Account in the amount of $1,200,000.00, and then fraudulently affected another wire transfer on March 15, 2022, from Mrs. Bucklin's Personal Account to Binance in the amount of $639,000.00.

7.      The transactions at issue were all highly irregular in light of Mrs. Bucklin's banking history, the frequency and amount of the fund transfers, and the recipients of the funds. In fact, prior to the unauthorized electronic and wire transfers in question, Mrs. Bucklin had never requested or made a wire transfer before in her entire life.

8.      Despite immediately disputing the unauthorized transactions, documenting the fraud directly with the Defendant and federal and state law enforcement authorities, the fact that the transactions were completely inconsistent with the Mrs. Bucklin's age, sophistication, and account history, and Defendant's complete lack of care with respect to Plaintiff and the Accounts, Defendant nevertheless denied Mrs. Bucklin's claims for reimbursement.

9.      Accordingly, Mrs. Bucklin hereby brings this action against Bank of America for violations of the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693, *et. seq.* ("EFTA"); violations of Article 4A of the Florida Uniform Commercial Code, Ch. 670, Fla. Stat.; breach of contract; and breach of the covenant of good faith and fair dealing; or, in the alternative, for negligence; negligent hiring, retention, training, and supervision; and promissory estoppel.

## PARTIES

10.      Plaintiff, Lynne M. Bucklin, is an individual and resident of the state of Florida and is otherwise *sui juris*.

11.      Mrs. Bucklin is a "consumer" as that term is defined by the EFTA, 15 U.S.C. § 1693a(6).

12.     At all times relevant to this action, Mrs. Bucklin maintained two (2) accounts with Bank of America that are and/or were used primarily for personal, family, or household purposes (*i.e.*, Plaintiff's Personal Account and the Estate Account), both of which are at issue in this matter.

13.     Defendant, Bank of America, N.A., is a national banking association organized under federal banking law with a principal place of business located at 100 North Tryon Street, Charlotte, NC 28255. At all times relevant to this action, Bank of America is and/or was a "financial institution" as that term is defined by the EFTA, 15 U.S.C. § 1693a(9), and a "creditor" as defined by 15 U.S.C. § 1602(g).

## JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction over this action pursuant to Section 26.012(2)(a), Florida Statutes, as this is an action for damages in excess of $1,500,000.00, exclusive of all interest, costs, attorneys' fees, special damages, and punitive damages.

15.     This Court has personal jurisdiction over Bank of America pursuant to Section 48.193(1)(a), Florida Statutes, because Bank of America operates, conducts, engages in, or carries on a business or business venture in the state of Florida; and pursuant to Section 48.193(1)(a)(6)(a), Florida Statutes, because Bank of America caused injury to persons within this state arising out of an act or omission by it outside of this state when, at or about the time of the injury, it engaged in solicitation or service activities within this state.

16.     Venue is proper in this Court pursuant to Section 47.011, Florida Statutes, as the causes of action alleged herein accrued in Collier County, Florida.

17.     All conditions precedent to the institution of this action have occurred, been waived, or otherwise been excused.

18.     Plaintiff has retained the undersigned law firm to represent her in this action and has agreed and obligated herself to pay the firm its reasonable attorneys' fees in connection with same.

## **FACTUAL ALLEGATIONS**

### *A.  The Relevant Scam*

19.     On or about February 24, 2022, Mrs. Bucklin received a phone call from an individual going by the name of Bruce Williams ("Williams") and claiming to be an investigative officer and financial expert for the FTC, who proceeded to inform Mrs. Bucklin that her social security number had been compromised.

20.      Immediately thereafter, Mrs. Bucklin received several electronic communications from Williams containing, among other things: (1) a picture of Williams' FTC badge; (2) Williams' FTC badge number; and (3) a letter from Williams' superiors informing Mrs. Bucklin that her social security number, bank accounts, including her Accounts with Bank of America, and other sensitive personal information had been compromised, that a formal investigation had been opened, and that Williams was a financial expert and FTC investigative officer assigned to her case.  ("FTC Letter"). A true and correct copy of the FTC Letter is attached hereto as "**Exhibit A**."

21.     The FTC Letter also provided Mrs. Bucklin with a phone number to contact Williams in case she wanted to ask any questions and to receive updates.

22.     Contemporaneous with and subsequent to receiving the electronic communications concerning Plaintiff's sensitive personal and financial information, Plaintiff was further victimized by a series of text messages and phone calls from Williams. Williams somehow knew that Mrs. Bucklin was going through probate for her late husband's Estate, and ultimately convinced Mrs.

Bucklin that if she told anyone about Williams' involvement, she would be in violation of a confidentiality agreement.

23.     Unbeknownst to Mrs. Bucklin, Williams then gained remote access to Mrs. Bucklin's computer to manipulate her Accounts online and steal her identity. Williams then used Mrs. Bucklin's email and other credentials to fraudulently establish an account with Binance under Mrs. Bucklin's name.

24.     After manipulating Plaintiff's bank account statements online without her knowledge or authorization, Williams used the fraudulent bank statements to convince Mrs. Bucklin that both the Personal Account and Estate Account had been compromised. Williams proceeded to instruct Mrs. Bucklin on the steps she would need to take in order to protect the funds in her Accounts.

25.     Specifically, and set forth in more detail below, Williams instructed Mrs. Bucklin that: (1) she needed to move quickly; (2) she could not tell anyone about Williams' involvement or she would be in violation of a confidentiality agreement; and (3) she needed to make a series of wire transfers from the Accounts and temporarily convert those funds into cryptocurrency, and, once the matter was resolved, the funds would be returned to Mrs. Bucklin's Accounts. At or around this time, Williams used Mrs. Bucklin's personal information to further victimize Mrs. Bucklin by opening a fraudulent account with Binance using Mrs. Bucklin's name.

### B.  The Fraudulent Funds Transfers

26.     Pursuant to Williams' instructions, on February 24, 2022, Mrs. Bucklin went to the Bank of America branch located at 899 Vanderbilt Beach Road, Naples, FL 34108 ("Pavilion Branch"), and requested Bank of America to make a wire transfer in the amount of $69,900.00 from her Personal Account to an account at Regions Bank in Albany, Georgia.

27.    Notably, Bank of America did not question the validity or stated purpose of Mrs. Bucklin's request and processed and sent the wire transfer that same day, despite the fact that Mrs. Bucklin had never before wired funds or even attempted to wire funds at any point prior to February 24, 2022. After this wire transfer was processed and sent, Mrs. Bucklin's Personal Account had a total balance of approximately $970,799.25.

28.    The next day (i.e., February 25, 2022), still acting pursuant to Williams' instructions, Mrs. Bucklin went to the Bank of America branch located at 5626 Tavilla Circle, Naples, FL 34110 ("the Strand Branch"), and requested Bank of America to make a wire transfer in the amount of $254,369.00 from her Personal Account to Binance's bank account in California.

29.    According to records from Bank of America dated February 25, 2022, the purpose of Mrs. Bucklin's wire transfer was "trade related," however, Bank of America did not inquire into Mrs. Bucklin's stated purpose or the validity of this transaction and processed and sent the wire transfer the following business day. After this wire transfer was processed and sent on February 28, 2022, Mrs. Bucklin's Personal Account had a total balance of approximately $716,430.25.

30.    On March 3, 2022, Mrs. Bucklin once again visited the Strand Branch and requested the same Bank of America representative that previously assisted Mrs. Bucklin transfer on February 25, 2022, that she wanted to make another wire transfer in the amount of $269,000.00 from her Personal Account to Binance's bank account for "trade related" purposes.

31.    The Bank of America representative at the Strand Branch once again failed to inquire into the validity of this wire transfer or Mrs. Bucklin's stated purpose and processed and sent the wire transfer that same day. After this wire transfer was processed and sent on March 3, 2022, Mrs. Bucklin's Personal Account had a total balance of approximately $447,430.25.

32.     On March 9, 2022, Mrs. Bucklin went to the Strand Branch for a third time and requested Bank of America to make yet another wire transfer in the amount of $369,000.00 from her Personal Account to Binance's bank account. Bank of America failed to inquire as to the validity or stated purpose of Mrs. Bucklin's request and attempted to process and send the wire transfer that same day. However, due to the frequency and amount of Mrs. Bucklin's previous two (2) wire transfers to Bincance, the beneficiary bank (i.e., SilverGate Bank) rejected the wire transfer on March 9, 2022, and returned the funds to Bank of America to be deposited back in Mrs. Bucklin's Personal Account.

33.     Upon learning that Binance rejected the March 9, 2022, wire transfer, Williams emailed Binance from Mrs. Bucklin's email account pretending to be her in attempt to convince Binance that these transactions were legitimate and to accept additional wire transfers. Unfortunately, after answering some basic questions posed by Binance, Williams succeeded in convincing Binance to accept more wire transfers from Mrs. Bucklin's Personal Account.

34.     On March 11, 2022, Mrs. Bucklin, still acting pursuant to Williams' instructions, went to the Pine Ridge Branch and requested Bank of America to make a wire transfer in the amount of $371,000.00 from her Personal Account to Binance's bank account, again for "trade related" purposes.

35.     Bank of America once again failed to inquire as to the validity or stated purpose of Mrs. Bucklin's wire transfer and processed and sent the wire that same day. After this wire transfer was processed and sent on March 11, 2022, Mrs. Bucklin's Personal Account had a total balance of approximately $76,430.25.

36.     Shockingly, Bank of America permitted these wire transfers despite the total balance of Mrs. Bucklin's Personal Account decreasing from $1,045,576.00 as of February 23,

2022, all the way down to $76,430.25 as of March 11, 2022, all the while failing to inquire as to the validity or stated purpose of the wire transfers in question.

37.     To make matter worse, on or about March 14, 2022, Williams gained unauthorized access to Mrs. Bucklin's Bank of America online banking account and transferred via ACH $1,200,000.00 from the Estate Account to Mrs. Bucklin's Personal Account.

38.     On the next day, March 15, 2023, Mrs. Bucklin went to the Strand Branch for the fourth time and requested the same Bank of America representative that assisted her the previous three (3) times to make a wire transfer from her Personal Account to Binance's bank account in the amount of $639,000.00. Bank of America once again failed to inquire as to the validity of this wire transfer or Mrs. Bucklin's stated purpose and processed and sent the wire transfer that same day.

39.     When the funds were not returned to Mrs. Bucklin's Accounts on March 17, 2022, Mrs. Bucklin immediately contacted the verified phone number for the FTC and told them what had happened, at which time the FTC informed Mrs. Bucklin that she had been the victim of a scam.

40.     Mrs. Bucklin immediately contacted Bank of America's Fraud Department and informed them of the fraudulent wire and electronic transfers in the Accounts (Claim Number: 18MAR2022-805133) and promptly submitted an IC3 Report to the FBI.

41.     During the relevant period, Mrs. Bucklin was under a tremendous amount of stress, as she had recently lost her husband, just had major surgery, and was in fear of losing her entire life savings, as well as the funds in the Estate Account for which she was responsible as personal representative of the Estate.

42.     Although Bank of America purportedly investigated the fraudulent transactions at issue, on May 8, 2022, Bank of America sent Mrs. Bucklin a letter related to her claim ("Claim Letter") which, among other things, informed Mrs. Buckling that: (1) Bank of America successfully recovered $438,900.00 of the total $1,972,269.00 transferred; (2) the Personal Account had been credited $438,900.00; and (3) Bank of America considered the inquiry closed. A true and correct copy of the Claim Letter is attached hereto as "**Exhibit B**."

43.     The Claim Letter does not provide any information as to how Bank of America recovered the $438,900.00 or why it considered the inquiry closed. Based on the Claim Letter, Mrs. Bucklin realized that Bank of America would not provide any assistance in recovering the remaining $1,533,369.00 that she had lost.

44.     During the relevant period, Mrs. Bucklin was under a tremendous amount of stress, as she had recently lost her husband, just had major surgery, and was in fear of losing her entire life savings as well as the funds in the Estate Account for which she was responsible as personal representative of the Estate.

### C.     *Bank of America Possessed Actual or Constructive Knowledge of the Fraud*

45.     Each year thousand (if not millions) of Americans fall victim to social engineering scams, such as the one Mrs. Bucklin fell victim to here, and other types of fraud, often times victimizing the elderly and vulnerable, which result in millions of dollars being stolen from bank accounts.

46.     As social engineering and other types of scams often involve direct or indirect theft from consumers' bank accounts, banking institutions have become all too familiar with the specific types of scams, the people they tend to target, and the manner in which they often occur. Accordingly, these financial institutions have been placed in the best position to spot and prevent

these scams from occurring or, at the least, in a position to best mitigate the negative consequences and financial and emotional harm they cause.

47.     Additionally, given these scams happen at an alarming rate, more and more people now take into consideration the privacy and security policies, procedures, and other account protections that financial institutions provide to clients and their accounts when deciding which bank to entrust with their funds.

48.     In an effort to gain a competitive edge, Bank of America and other large financial institutions are currently engaging in a marketing war with respect to the privacy and security policies and features that each has to offer to their clients and their bank accounts.

49.     Bank of America, for example, has dedicated an entire section of its website to privacy and security.[1] On this webpage, the Bank of America states, among other things, that "[y]our security is our top priority" and "together we can identify and prevent fraud events." A true and correct copy of this webpage is attached hereto as "**Exhibit C.**"

50.     Additionally, this webpage has a link reading "[l]atest scam trends and red flags" which takes you to a separate page containing the different types of scams and information on each. A copy of this webpage is attached hereto as "**Exhibit D.**"

51.     Bank of America has numerous articles on its website regarding the superior privacy and security protection it offers to account holders, as well as information on particular types of scams and the tactics used by the scammers in each one. A copy of two (2) of these articles are attached hereto as "**Composite Exhibit E.**"

52.     As evidenced by these articles and other representations regarding privacy and security, at all times relevant to this action, Bank of America possessed actual knowledge of the

---

[1] *See* Bank of America, *Privacy and Security*, https://www.bankofamerica.com/security-center/overview/ (last visited February 15, 2024).

different types, most targeted victims, and pervasiveness of social engineering scams in the banking industry. For example, and relevant to the case at hand, in the article titled "Cyber Security: Talk to friends and family about scams," Bank of America states, among other things: "Scammers are increasingly using sophisticated social engineering tactics to gain access to your money and data." **Ex. D, pg. 1**.

53.     In light of Mrs. Bucklin's banking history, including, but not limited to, the fact that she had never before made or even attempted to make a wire transfer, as well as the frequency, amount, purpose, and recipients of the fraudulent transfers at issue, it is apparent that Bank of America knew or should have known that Mrs. Bucklin was the victim of a scam.

54.     Furthermore, despite Bank of America's representation to consumers, such as Mrs. Bucklin, that "[y]our security is our top priority" and "together we can identify and prevent fraud events," Bank of America did nothing to warn or protect Mrs. Bucklin against fraud.

55.     Rather, in reality, Bank of America does not care about consumers' privacy or security and instead made these representations in an effort to attract clients and gain a competitive edge. Then, when the client disputes the transactions with Bank of America, Bank of America denies their claim and provides no information as to why and disclaims all liability.

56.     For example, in the case at hand, the fraudulent transactions at issue were completely inconsistent with Mrs. Bucklin's banking history, yet Bank of America did not warn Mrs. Bucklin of any fraud or potential fraud and nothing to prevent, mitigate, or recover the fraudulent transfers.

57.     Moreover, despite the fact that Mrs. Bucklin formally and timely disputed the unauthorized transactions with Bank of America, Bank of America denied her claim and failed to provide any explanation or other information as to the reason(s) why the claim was denied. Instead,

Bank of America threatened to take legal action against Mrs. Bucklin if she pursued any further action against Bank of America to recoup the stolen funds.

58.     To date, Bank of America has not returned the remaining $1,533,369.00 that was stolen from Mrs. Bucklin's Accounts.

**D.     Bank of America Funds Transfer Agreement and Online Banking Service Agreement**

59.     With respect to the Personal Account and Estate Account with Bank of America, Mrs. Bucklin and Bank of America agreed to the terms and conditions set forth in, *inter alia*, the Bank of America Online Banking Service Agreement ("Online Banking Agreement"), a copy of which is attached hereto as "**Exhibit F**."

60.     According to Section 8 of the Online Banking Agreement, consumers will have no liability for unauthorized transactions if they notify Bank of America within sixty (60) days after the statement showing the transaction has been given to the consumer. *See* **Ex. F, pg. 20**. Specifically, Section 8 states, in pertinent part, the following:

> *You will have no liability for unauthorized transactions if you notify us within 60 days after the statement showing the transaction has been sent to you (or 90 days if the transaction was from an account maintained at another financial institution). If you do not, you may not get back any of the money you lost from any unauthorized transaction that occurs after the close of the 60-day period (or 90-day period if the transaction was from an account maintained at another financial institution), if we can show that we could have stopped the transaction if you had notified us in time. If a good reason (such as a long trip or hospital stay) kept you from telling us, we may extend the time periods.*

**Ex. F, pg. 20**.

61.     In the case at hand, Mrs. Bucklin notified Bank of America on March 18, 2022, of the unauthorized electronic ACH transfer from the Estate Account to the Personal Account made on March 14, 2022, in the amount of $1,200,000. However, despite Mrs. Bucklin notifying Bank

of America just four (4) days after the unauthorized electronic ACH transfer was made, Bank of America failed to return the funds to Mrs. Bucklin.

62.     Additionally, each of the fraudulent wire transfers above are subject to the Bank of America Funds Transfer Agreement ("Funds Transfer Agreement"), a copy of which is attached hereto as "**Exhibit G**."

63.     According to the Funds Transfer Agreement, Bank of America and Mrs. Bucklin agreed that Bank of America has the responsibility to exercise reasonable and ordinary care in processing, approving, and sending wire transfers from Mrs. Bucklin's Accounts.

64.     However, given Mrs. Bucklin's banking history, and the frequency, amount, and recipients of the wire transfers at issue, it is clear that Bank of America failed to act with reasonable and ordinary care and neglected to protect Mrs. Bucklin as they agreed to do.

65.     As the result, Mrs. Bucklin brings this action against Bank of America for violations of the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693, *et. seq.* ("EFTA"); violations of the Florida UCC § 4-A, Ch. 670, Fla. Stat.; breach of contract; and breach of the covenant of good faith and fair dealing; or, in the alternative, for negligence and negligent hiring, retention, training, and supervision.

## CLAIMS FOR RELIEF

### COUNT I
### Violation(s) of the EFTA, 15 U.S.C. § 1693, *et. seq.*

66.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 65 above and incorporates them by reference as if specifically set forth herein.

67.     Per the EFTA, Regulation E, and Regulation E's Official Interpretations, Bank of America bears the responsibility for unauthorized electronic funds transfers, such as the electronic

funds transfer in question from the Estate Account to the Personal Account in the amount of $1,200,000.00.

68.     Pursuant to 15 U.S.C. § 1693g(a), which states, in relevant part, the following:

In no event . . . shall a consumer's liability for an unauthorized transfer exceed the lesser of –

(1) $50; or

(2) the amount of money or value of property or services obtained in such, unauthorized electronic fund transfer prior to the time the financial institution is notified of, or otherwise becomes aware of, circumstances which lead to the reasonable belief that an unauthorized electronic fund transfer involving the consumer's account has been or may be effected.

15 U.S.C. § 1693g(b).

69.     Thus, the consumer's liability for unauthorized use is generally capped at a maximum of $50 for unauthorized transfers.

70.     The rules are elucidated in Regulation E, 12 C.F.R. § 1005.6(b):

(b) Limitations on amount of liability. A consumer's liability for an unauthorized electronic fund transfer or a series of related unauthorized transfers shall be determined as follows:

(1) Timely notice given. If the consumer notifies the financial institution within two business days after learning of the loss or theft of the access device, the consumer's liability shall not exceed the lesser of $50 or the amount of unauthorized transfers that occur before notice to the financial institution.

(2) Timely notice not given. If the consumer fails to notify the financial institution within two business days after learning of the loss or theft of the access device, the consumer's liability shall not exceed the lesser of $500 or the sum of:

(i) $50 or the amount of unauthorized transfers that occur within the two business days, whichever is less; and

(ii) The amount of unauthorized transfers that occur after the close of two business days and before notice to the institution, provided the institution establishes

> that these transfers would not have occurred had the
> consumer notified the institution within that two-day
> period.

71.     Denials based on a consumer's alleged negligence are expressly prohibited under

the EFTA's implementing regulations. See Consumer Financial Protection Bureau, Comment for

1005.6 Liability of Consumer for Unauthorized Transfers, 6(b)(2) ("Negligence by the consumer

cannot be used as the basis for imposing greater liability than is permissible under Regulation E.

Thus, consumer behavior that may constitute negligence under state law, such as writing the PIN

on a debit card or on a piece of paper kept with the card, does not affect the consumer's liability

for unauthorized transfers.").

72.     The EFTA places the burden of proof on the financial institution to demonstrate

that challenged transfers were authorized or, if they were unauthorized, that the consumer can be

held liable for them. See 15 U.S.C. § 1693g(b).

73.     Bank of America will not be able to meet its burden of proof regarding the contested

transactions to/from the Plaintiff's Accounts.

74.     Further, the ACH transfers between Plaintiff's Accounts are not wire transfers and

are therefore not excluded from coverage under the EFTA. See 12 C.F.R. § 205.3(c)(3).

75.     Additionally, Plaintiff received no benefit from the unauthorized transfers between

her Accounts and are therefore, similarly, not excluded from the EFTA's coverage. See id.

76.     Bank of America further violated the EFTA by failing to provide any meaningful

explanation of the grounds upon which it relied in denying Plaintiff's claim. 15 U.S.C. § 1693f(d);

see CFPB Supervisory Highlights, Issue 22, Summer 2020, Section 2.3.3 ("Financial institutions

must go beyond just providing the findings to actually explain or give the reasons for or cause of

those findings.").

77.     As a direct and proximate result of Bank of America's conduct, Plaintiff suffered actual damages, including, but not limited to, past and future monetary loss, past and future mental distress, emotional anguish, and other damages that will be presented to the trier of fact at trial.

78.     As a direct and proximate result of Bank of America's violation of the EFTA, Plaintiff is entitled to an award of statutory and actual damages, as well as attorney's fees and costs.

79.     Bank of America did not conduct a good faith investigation regarding the stolen funds from Plaintiff's Accounts.

80.     Bank of America did not have a reasonable basis for believing the transfers from the Accounts were not in error.

81.     Specifically, Bank of America's conduct as set forth herein constitutes a failure to investigate in good faith and a failure to establish a reasonable basis for believing that the transfer from the Estate Account to Plaintiff's Personal Account, proximately leading to the theft, was not in error, and also constitutes a knowing and willful conclusion that Plaintiff's Accounts were not in error when such conclusion could not reasonably have been drawn from the available evidence, and therefore constitutes a violation of 15 U.S.C § 1693f(e), entitling Plaintiff to treble damages in addition to all other relief sought herein.

**WHEREFORE**, Plaintiff, LYNNE M. BUCKLIN, respectfully demands judgment against Defendant, BANK OF AMERICA, N.A., for all actual damages in an amount not less than $1,200,000.00, statutory and treble damages pursuant to the EFTA, pre-judgment and post-judgment interest, and an award of reasonable attorneys' fees and costs, and for any such other relief that Plaintiff may be entitled to or which this Court deems just and appropriate.

<u>**COUNT II**</u>
<u>**Violations of the Florida UCC § 4-A, Ch. 670, Fla. Stat.**</u>

82.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 81

above and incorporates them by reference as if set forth herein.

83.      Pursuant to Section 670.202(2), Florida Statutes,

If a bank and its customer have agreed that the authenticity of payment orders
issued to the bank in the name of the customer as sender will be verified pursuant
to a security procedure, a payment order received by the receiving bank is effective
as the order of the customer, whether or not authorized, if the security procedure is
a commercially reasonable method of providing security against unauthorized
payment orders and the bank proves that it accepted the payment order in good faith
and in compliance with the security procedure and any written agreement or
instruction of the customer restricting acceptance of payment orders issued in the
name of the customer.

Fla. Stat. § 670.202(2).

84.     Additionally, pursuant to Section 670.202(3), Florida Statutes,

The commercial reasonableness of a security procedure is a question of law to be
determined by considering the wishes of the customer expressed to the bank; the
circumstances of the customer known to the bank, including the size, type, and
frequency of payment orders normally issued by the customer to the bank;
alternative security procedures offered to the customer; and security procedures in
general use by customers and receiving banks similarly situated.

Fla. Stat. § 670.202(3).

85.     In the case at hand, Bank of America either failed to follow the agreed upon security

procedure or said security procedure was not commercially reasonable for, among other things,

the following reasons: (1) Bank of America failed to act with reasonable and ordinary care in

processing, approving, and sending the wire transfer; or (2) the security procedure was not

commercially reasonable in light of the circumstances of Mrs. Bucklin known to Bank of America,

including, but not limited to, the size, type, and frequency of payment orders (i.e., wire transfers)

normally issued by Mrs. Bucklin to Bank of America.

86.     Thus, Bank of America is liable for the wire transfers at issue in this case because Bank of America did not follow the agreed upon security procedure for payment orders or said security procedure was not, as a matter of law, commercially reasonable in light of the facts and circumstances of Mrs. Bucklin known to Bank of America.

87.     As a result, Bank of America must reimburse Mrs. Bucklin for the remaining stolen funds.

88.     As set forth above, Bank of America failed to establish, maintain, implement, and follow commercially reasonable security procedures such that it may claim that it accepted the payment in good faith.

89.     As set forth above, Bank of America's failure to establish, maintain, implement, and follow commercially reasonable security procedures directly led to the theft of $1,533,369.00, plus bank fees from Plaintiff's Accounts, by way of unauthorized wire transfers.

90.     As set forth above, Plaintiff notified Bank of America immediately upon discovery of the unauthorized transfers.

91.     The wire transfers that Bank of America permitted without authorization involved the vast majority of the funds then existing in the Plaintiff's Accounts.

92.     Nonetheless, Bank of America ultimately effectuated the transfer(s).

93.     Section 670.204, Florida Statutes, states, in pertinent part, that:

> If a receiving bank accepts a payment order issued in the name of its customer as sender which is not authorized and not effective as the order of the customer under s. 670.202 or is not enforceable, in whole or in part, against the customer under s. 670.203, the bank shall refund any payment of the payment order received from the customer to the extent the bank is not entitled to enforce payment and shall pay interest on the refundable amount calculated from the date the bank received payment to the date of the refund.

Fla. Stat. § 670.204(1).

94.     Given the foregoing, Bank of America was required to issue a refund to Plaintiff and to pay interest on the refundable amount(s).

95.      Plaintiff immediately and repeatedly notified Bank of America regarding the wire transfers once the fraud was discovered, yet Bank of America has refused to issue a refund apart from the comparatively small amounts referred to hereinabove ($438,900.00).

96.     Bank of America failed to investigate the disputed transactions properly or meaningfully, and instead held Plaintiff liable for the fraudulent wire transfers.

97.     For failing to implement commercially reasonable security procedures and for its failure to investigate and refund the stolen funds, Defendant has violated Article 4-A of the Florida UCC.

**WHEREFORE**, Plaintiff, LYNNE M. BUCKLIN, respectfully demands judgment against Defendant, BANK OF AMERICA, N.A., for all actual damages in an amount not less than $1,533,369.00, pre-judgment and post-judgment interest, costs, and for any such other relief that Plaintiff may be entitled to or which this Court deems just and appropriate.

## COUNT III - Breach of Contract

98.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 97 above and incorporates them by reference as if fully set forth herein.

99.     Pursuant to Section 8 of the Online Banking Agreement, Bank of America agreed that Mrs. Bucklin would have no liability for unauthorized transactions which she notified Bank of America of within sixty (60) days after the statement showing the transaction has been given to the consumer. *See* **Ex. at pg. 20**.

100.     Mrs. Bucklin notified Bank of America on March 18, 2022, of the unauthorized electronic ACH transfer from the Estate Account to the Personal Account that was made on March 14, 2022, in the amount of $1,200,000.

101.    However, despite Mrs. Bucklin notifying Bank of America just four (4) days after the unauthorized electronic ACH transfer was made, Bank of America failed to return the funds to Mrs. Bucklin.

102.    Thus, Bank of America is in breach of the Online Banking Agreement.

103.    Additionally, pursuant to the Funds Transfer Agreement, Bank of America and Mrs. Bucklin agreed that Bank of America had the responsibility to exercise reasonable and ordinary care in processing, approving, and sending wire transfers from Mrs. Bucklin's Accounts.

104.    However, given Mrs. Bucklin's banking history, and the frequency, amount, and recipients of the wire transfers at issue, it is clear that Bank of America failed to act with reasonable and ordinary care and neglected to protect Mrs. Bucklin as they agreed to do.

105.    Thus, Bank of America breached the Funds Transfer Agreement.

106.    As a direct and proximate cause of Bank of America's breaches above, among others, Plaintiff has been significantly damaged.

**WHEREFORE**, Plaintiff, LYNNE M. BUCKLIN, respectfully requests the Court to enter final judgment against Defendant, BANK OF AMERICA, N.A., for all compensatory damages arising from Defendant's breach of the Funds Transfer Agreement and Online Banking Agreement, including costs and reasonable attorneys' fees, and for any other relief this Court deems appropriate under the circumstances.

## COUNT IV
### Breach of Implied Covenant of Good Faith and Fair Dealing

107.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 106 above and incorporates them by reference as if fully set forth herein.

108.    Defendant, Bank of America, had an obligation under the Funds Transfer Agreement to exercise reasonable and ordinary care in processing, approving, and sending wire transfers from Mrs. Bucklin's Accounts.

109.    Additionally, Bank of America had an obligation under the Online Banking Agreement to conduct a good-faith investigation into unauthorized transactions in Mrs. Bucklin's Accounts and to provide her with an explanation as to why her claims were rejected.

110.    Bank of America failed to act in good faith in discharging these obligations, and was in the best position to prevent Mrs. Bucklin's loss in light of Bank of America's familiarity with and knowledge of social engineering scams and the representations it makes regarding privacy and security.

111.    On numerous occasions in connection with the marketing and advertising of its banking services and products, Bank of America represented to Mrs. Bucklin and other consumers that their "security is our top priority" and that Bank of America would work side by side with Mrs. Bucklin to prevent her from falling victim to such scams.

112.    However, as set forth in detail above, Bank of America did not care about the security of Mrs. Bucklin's Accounts and did not discharge their obligations in good faith. Instead, Bank of America disregarded the numerous red flags, failed to act with reasonable care, and when Mrs. Bucklin made a claim with Defendant, Defendant told Mrs. Bucklin that she was on her own.

**WHEREFORE**, Plaintiff, LYNNE M. BUCKLIN, respectfully requests the Court to enter final judgment against Defendant, BANK OF AMERICA, N.A., for all compensatory damages of $1,533,369.00, costs, and for any other relief this Court deems appropriate under the circumstances.

*{Remainder of Page Intentionally Left Blank}*

*{Continues on Following Page}*

## COUNT V - Negligence
## (Plead in the Alternative)

113.    Plaintiff repeats and realleges the allegations contained in the paragraphs 1 through 112 above and incorporates them by reference as if specifically set forth herein.

114.    By undertaking to assist Plaintiff in securing her Accounts and the funds therein, and by representing that the Accounts' security was its top priority, Bank of America voluntarily assumed duties to Plaintiff.

115.    By processing, approving, and sending the wire transfers in question, Bank of America failed to exercise reasonable care and failed to act carefully with respect to the duties it voluntarily assumed.

116.    Bank of America possessed actual or constructive knowledge of the kind of scam Mrs. Bucklin fell victim to yet failed to act with reasonable or ordinary care with respect to Mrs. Bucklin's Accounts.

117.    Indeed, these failures to act reasonably and carefully with regard to duties voluntarily assumed resulted in all of Plaintiff's losses.

118.    As a direct and proximate result of Bank of America's conduct, Plaintiff has suffered actual damages, including, but not limited to, past and future monetary loss, past and future emotional distress and anguish, and other damages that will be presented to the trier of fact.

**WHEREFORE**, Plaintiff, LYNNE M. BUCKLIN, respectfully requests the Court to enter final judgment against Defendant, BANK OF AMERICA, N.A., for all compensatory damages of $1,533,369.00, costs, and for any other relief this Court deems appropriate under the circumstances.

*{Remainder of Page Intentionally Left Blank}*
*{Continues on Following Page}*

## COUNT VI – Negligent Hiring, Retention, Training, And Supervision
### (Plead in the Alternative)

119.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 118 above and incorporates them by reference as if set forth specifically herein.

120.    Bank of America failed to exercise reasonable care in selecting, instructing and supervising the employees and/or agents it hired to process, approve, and send wire transfers, and to support their customers' fraud claims.

121.    Bank of America did not properly train or supervise the employees and/or agents who process, approve, and send wire transfers and/or who support their customers' fraud claims.

122.    Bank of America owed a duty of care to the Plaintiff such that its employees and agents would act in accordance with state and federal laws.

123.    As a direct result and proximate cause of Bank of America's employees and/or agents' unreasonable, negligent, unfair, illegal and/or fraudulent conduct, Plaintiff has suffered harm including, without limitation, the damages set forth above.

124.    As a result of the foregoing, Plaintiff has suffered actual damages, including but not limited to past and future monetary loss, past and future emotional distress and anguish, and other damages that will be presented to the trier of fact.

**WHEREFORE**, Plaintiff, LYNNE M. BUCKLIN, respectfully requests the Court to enter final judgment against Defendant, BANK OF AMERICA, N.A., for all compensatory damages of $1,533,369.00, costs, and for any other relief this Court deems appropriate under the circumstances.

## COUNT VII – Promissory Estoppel
### (Plead in the Alternative)

125.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 124 above and incorporates them by reference as if fully set forth herein.

126.    Bank of America guarantees that customers, such as Mrs. Bucklin, are never liable for unauthorized purchases or transactions—as long as they are reported promptly.

127.    Furthermore, on numerous occasions, in connection with the advertising, marketing, promoting, or otherwise marketing of its banking services and products, Bank of America inaccurately represents to consumers, such as Mrs. Bucklin, that: (1) customers are never liable for unauthorized their security is Bank of America's top priority; (2) Bank of America provides 24/7, real-time monitoring for suspicious account activity; (3) Bank of America protects against threats with an award-winning cybersecurity team that delivers comprehensive security round-the-clock; and (4) Bank of America alerts customers of potential fraud through the mobile app, text alerts, email, or phone.

128.    In deciding to bank with Bank of America, Mrs. Bucklin relied on Bank of America's guarantees regarding liability for unauthorized transaction and representations regarding privacy and security.

129.    However, when Mrs. Bucklin timely disputed the unauthorized transactions in question with Bank of America, Bank of America denied her claim for reimbursement and seeks to hold her liable for the loss—in direct contradiction to Bank of America's "guarantee."

130.    Furthermore, during the Relevant Period, Bank of America failed to monitor Mrs. Bucklin's Accounts for suspicious activity, or, if Bank of America did monitor the Accounts, it failed to recognize and alert Mrs. Bucklin of the suspicious activity. In fact, during the Relevant Period, Mrs. Bucklin did not receive a single phone call, text message, email, or any other kind of alert warning that she was the victim of a scam or that there was suspicious activity in her Accounts.

131.   In deciding which bank was best to entrust with her entire life savings, Mrs. Bucklin relied on Bank of America's guarantee that she would not be liable for unauthorized transactions and the representation that her privacy and security was Bank of America's top priority.

132.   Unfortunately for Mrs. Bucklin, Bank of America did nothing to protect Mrs. Bucklin's Accounts and now seeks to hold her liable for unauthorized and fraudulent transactions, despite Bank of America's representations and promises to the contrary.

133.   As the result, Mrs. Bucklin has been significantly damaged.

**WHEREFORE**, Plaintiff, LYNNE M. BUCKLIN, respectfully requests the Court to enter final judgment against Defendant, BANK OF AMERICA, N.A., for all compensatory damages of $1,533,369.00, costs, and for any other such relief as this Court deems appropriate under the circumstances.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiff, Lynne M. Bucklin, hereby demands a trial by jury on all issues so triable under Florida law.

DATED:   <u>February 23, 2024</u>.

Respectfully Submitted,

**VERNON LITIGATION GROUP**
*Attorneys for Plaintiff*

<u>*/s/ Bernard C. Carollo, Jr.*</u>
Bernard C. Carollo, Jr.
Florida Bar No. 1035487
Christopher T. Vernon
Florida Bar No.: 748110
3520 Kraft Road, Suite 203
Naples, FL 34105
Phone: (239) 649-5390
Facsimile: (239) 294-3917
E-mail: bcarollo@vernonlitigation.com
E-mail: cvernon@vernonlitigation.com

26